**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-21072

_____

UNITED STATES OF AMERICA,

                                                    Plaintiff-Appellee,

VERSUS

JERALD J. HENDRICKS; WILLIAM P. VERKIN, MICHAEL J. FRYE,

                                                    Defendants-Appellants.

_____

Appeal from the United States District Court
For the Southern District of Texas
(CR-H-94-141)

_____

May 15, 1997

Before GARWOOD, DeMOSS and PARKER, Circuit Judges.

PER CURIAM:[*]

    William  P.  Verkin  ("Verkin"),  Jerald  J.  Hendricks
("Hendricks") and Michael J. Frye ("Fyre") appeal their convictions
for conspiracy to commit bank fraud in violation of 18 U.S.C. § 371

---

    [*]  Pursuant to Local Rule 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

and bank fraud in violation of 18 U.S.C. § 1344.  For the following reasons, we reverse.

## PROCEEDINGS AND DISPOSITION BELOW

Verkin, Hendricks, Frye and Joseph Russo ("Russo") were charged in a two count indictment with bank fraud and conspiracy to commit bank fraud.  Russo pleaded guilty and testified against the others.  During trial, the district court granted a motion for judgment of acquittal as to the first paragraph of Count One which charged the defendants with conspiring to defraud the United States, but denied a motion for acquittal on the remaining paragraph which charged conspiracy to defraud a credit union.  The jury found Verkin, Hendricks and Frye guilty of both conspiracy and bank fraud.

Verkin was sentenced to two consecutive two-year terms of confinement.  Frye and Hendricks were each sentenced to two consecutive three-year terms of confinement.

## FACTS[1]

This case involves two interrelated transactions; the defendants' purchase of 500 acres on I-45 in League City, Texas and of a Coors Beer distributorship in San Antonio, Texas from Burkett's Distributing Company.

---

[1]The record contains conflicting evidence about the exact amount of some relevant figures.  These discrepancies do not impact the issues before this court.  We therefore make no attempt to resolve the discrepancies and use approximate figures in the recitation of facts.

In November 1986, Verkin, a licensed real estate agent, executed earnest money contracts for the League City acreage as trustee for an undisclosed principal. The purchase price was $8.9 million, with a down payment of $1.5 million, and the remainder to be financed by the owners, a group of related entities referred to as the Campbell Estate. The land was valued at $32 million by contemporaneous appraisals. Verkin later negotiated for 41 of the 500 acres of the land to be transferred free and clear.

In the summer of 1986, Pat Gooden, a business broker, alerted Frye and Hendricks to the availability of the beer distributorship. The distributorship was in default on $6 million in loans from the Government Employee's Credit Union ("GECU") and had other indebtedness of $4 million. Frye and Hendricks decided to buy the distributorship and proposed refinancing the distributorship debt through GECU and reallocating a portion of that debt to the League City acreage. On February 5, 1987, GECU approved a $9,649,000 loan for "down payment and contingency residual principal and interest in connection with a work out loan for acquisition of Burkett's Distributing and acquisition of land in [League City], Texas."

In February 1987 Verkin attempted to negotiate an agreement with some members of the Campbell Estate whereby they would retain an interest in the joint venture. That proposal was never consummated. Instead, on February 24, 1987, Verkin entered a joint venture agreement with George Beach III ("Beach"), his second cousin and employee. The agreement required Beach "upon the

3

request of Verkin [to] cause legal title to the Venture Property to be conveyed to the Joint Venture." The agreement gave Verkin an option to purchase Beach's interest in the venture and in the League City property for $2.2 million. Hendricks, Frye, Verkin and Russo entered into a second joint venture agreement, which noted that Beach had conveyed his interest in the real estate to them.

At closing, Beach received $2.2 million, which he endorsed back to the defendants' joint venture, in return for a $5000 payment. Hendricks, Frye, Verkin and Russo then applied the loan proceeds to the purchase price of the beer distributorship, the real estate, the various expenses connected with the transactions and a payment of $226,826 to each of the four defendants. The $226,826 payments are the focus of this prosecution.

## ADMISSIBILITY OF CO-DEFENDANT'S WRITTEN PROFFER

The district court admitted a written proffer of evidence attached to Russo's plea agreement. We review challenged evidentiary rulings for abuse of discretion. *United States v. Buchanan*, 70 F.3d 818, 832 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1340 (1996).

During redirect examination of Russo, the government offered its plea agreement with Russo into evidence, contending it was admissible as a prior consistent statement. The defendants did not object to the admission of the plea agreement, but did object to the proffer, on the grounds that it was hearsay and inadmissable as

4

a prior consistent statement because there had been no allegation of recent fabrication. The government responded that under 801(d)(1)(B) it was proper to introduce prior statements that Russo had adopted to rebut the implied charge of improper influence or motive. The district court allowed the document into evidence and permitted Russo to read portions of it to the jury.

Rule 801(d)(1)(B) provides:

> A statement is not hearsay if -
> (1) Prior statement by witness -- The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is. . .
> (B) consistent with the defendant's testimony and is offered to rebut an express or implied charge against the declarant or recent fabrication or improper motive.

FED. R. EVID. 801(d)(1)(B). In *Tome v. United States*, 513 U.S. 150, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995)[2], the Supreme Court held:

> [Rule 801(d)(1)(B)] permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper motive only when those statements were made before the recent fabrication or improper influence or motive.

513 U.S. at 155, 115 S.Ct. at 705. Because the proffer was written after the improper influence or motive arose, it was clearly not admissible under Rule 801(d)(1)(B) as interpreted by *Tome*. Admitting the proffer was thus error. *United States v. Riddle*, 103 F.3d 423, 432 (5th Cir. 1997).

---

[2]*Tome* was decided on January 10, 1995. This case was tried in August 1995.

5

The government concedes that the admission of the proffer violates the holding of *Tome*, but argues that the error was harmless.

ADMISSIBILITY OF DEFENDANTS' DEPOSITION TESTIMONY

The district court admitted portions of deposition testimony given by Frye and Verkin in a related bankruptcy proceeding as well as Frye's answers to interrogatories pursuant to Rule 801(d)(2)(E), as statements of co-conspirators. The defendants objected, citing *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) and arguing that the statements were not made in furtherance of the conspiracy. The district court found that the statements were made in the furtherance of the conspiracy, overruled the objections and denied defendants' requests for severance and limiting instructions.

We review the admission of co-conspirator statements under Rule 801(d)(2)(E) for abuse of discretion. *United States v. Krout*, 66 F.3d 1420 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 963 (1996). The district court's findings of fact relating to the admission are reviewed for clear error. *United States v. Stephens*, 964 F.2d 424, 434 (5th Cir. 1992).

A statement by a co-conspirator is not admissible if the person making the statement does not testify at trial. *United States v. Restrepo*, 994 F.2d 173, 186 (5th Cir. 1993). The government must prove, and the trial court must find, by a

6

preponderance of the evidence that the statements were made in the furtherance of the conspiracy to be admissible under Rule 801(d)(2)(E). *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). A statement made after the conclusion of the conspiracy is not admissible under Rule 801(d)(2)(E). *See United States v. Esacove*, 943 F.2d 3, 4 (5th Cir. 1991).

The government took the position at trial that the answers to interrogatories and deposition testimony were designed to conceal the conspiracy and to prevent its discovery. In *Grunewald v. United States*, 353 U.S. 391, 401-02, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957) the Supreme Court distinguished acts of concealment done in furtherance of the main criminal objectives of the conspiracy from acts of concealment done after these central objectives have been attained for the sole purpose of covering up after the crime. 353 U.S. at 405. In this case, the main objective of the alleged conspiracy -- obtaining the excess loan proceeds -- was attained in March 1987, when the loan was funded. The statements in question were made by the defendants years after the receipt of the proceeds.

The prosecution included in the indictment as an additional objective of the conspiracy "to prevent the detection of their receipt of the money." The government argued in the district court that because of this allegation, the co-conspirator statements

qualified as "made in furtherance of the conspiracy." The government's brief on appeal does not mention this theory of admissibility. Instead, they argue that the depositions and interrogatories were properly admissible under Rule 801(d)(2)(D) as "a statement of the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, citing *United States v. Saks*, 964 F.2d 1514, 1523-26 (5th Cir. 1992).

We reject the district court's implicit finding that the statements were made "in furtherance" of the conspiracy as contrary to the Supreme Court's mandate in *Grunewald*. Further, the record does not reflect the factual predicate necessary for 801(d)(2)(D) admissibility. We therefore find that the district court erred in admitting the defendants' deposition testimony and answers to interrogatories.

## HARMLESSNESS

We must next determine whether these errors, either standing alone or cumulatively, were so harmful that they mandate reversal. The Russo proffer, authored by the prosecutor, is particularly troublesome for two reasons. First, it was the government's version of the case, capsulized in written form, available to the jury during deliberations. Second, the proffer was much more favorable to the government's theory of the case than the actual testimony by Russo at trial because it contained statements about

8

the defendants' state of mind, GECU "knowledge" and what GECU would have done had it known the true facts, none of which was included in Russo's trial testimony.

The defendants' statements, made years after the alleged crime, as part of a bankruptcy proceeding are likewise harmful, imputing to the defendants an intent to conceal their activities surrounding the transactions in question.

The cumulative effect of these two errors, in light of the fact that the remaining evidence in this case raised real sufficiency concerns, requires reversal for new trial. *See United States v. Riddle*, 103 F.3d 423, 434 (5th Cir. 1997).

SUFFICIENCY OF THE EVIDENCE

Hendricks, Frye and Verkin each challenge the sufficiency of the evidence to sustain their convictions. Viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, this court must determine whether a rational jury could have found the essential elements of the offenses beyond a reasonable doubt. *United States v. Aubin*, 87 F.3d 141, 144 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 965 (1997).

To establish a conspiracy under 18 U.S.C. § 371, the government must prove (1) there was an agreement between two or more persons to pursue an unlawful objective; (2) the defendant voluntarily agreed to join the conspiracy; and (3) that one of the persons committed an overt act in furtherance of the conspiracy.

9

*United States v. Pettigrew*, 77 F.3d 1500, 1519 (5th Cir. 1996). The agreement to join the conspiracy need not be express, but may be inferred from circumstantial evidence. *Id.* To sustain a bank fraud conviction under 18 U.S.C. § 1344, the government must prove that the defendant knowingly executed or attempted to execute a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any property owned by, or under the custody or control of, a financial institution by means of false or fraudulent pretenses, representations or promises. A "scheme to defraud" includes the use of fraudulent pretenses or representations intended to deceive to obtain something of value from a financial institution. The defendant must make a material misrepresentation to the bank, that is, one having "the natural tendency to influence or was capable of influencing the decision of the lending institution." *United States v. Campbell*, 64 F.3d 967, 975 (5th 1995).[3] It is clear and undisputed that neither borrowing excess

---

[3]The Supreme Court recently held that materiality of the falsehood is not an element of the crime of making a false statement to a federally insured bank under 18 U.S.C. § 1014, after concluding that the term "false statement" contained in that statute incorporated no common law meaning requiring materiality. *United States v. Wells*, ___U.S.___, 117 S. Ct. 921, 927-29, 137 L. Ed. 2d 107 (1997). The statute at issue here proscribes "fraud." The term "fraud" has traditionally encompassed the requirement of a *material* misrepresentation or omission in order to be actionable. *See BMW of North America v. Gore*, ___U.S.___, 116 S. Ct. 1589, 1600-1601, 134 L. Ed. 2d 809 (1996). We therefore conclude that *Wells* does not abrogate the Fifth Circuit rule, articulated in *Campbell,* requiring the government to prove materiality in a bank fraud case. *See United States v. Cochran*, 1997 WL 13790, *7 n.3 (10th Cir., March 25, 1997).

money nor using a trustee (or "strawman," as the government referred to Beach) are crimes. Rather, the government contends that the convictions are based on affirmative concealment intended to defraud -- that is concealment of the fact that the defendants received proceeds beyond what was necessary to purchase the assets.

The defendants contend that this is a legitimate but complex business deal that GECU entered into because it benefitted financially; the transaction bailed GECU out of a disastrous preexisting loan on the beer distributorship. They contend that GECU got exactly what it bargained for in terms of both collateral and risk, and that distribution of the loan proceeds, as well as Beach's role, were revealed in the closing papers. Further, Verkin contends that he was entitled to, but did not receive, a real estate commission on the deal that was greater than the amount he received as his share of the proceeds, making it unlikely that he intentionally committed fraud to get less than he had earned on commission.

The government relies primarily on the testimony of former GECU employee Carol Cambern that she did not know that the loan included excess proceeds and if she had known, she would not have voted to approve the loan. The government argues that Cambern's testimony was "circumstantially corroborated" by the fact that the credit union required a $300,000 certificate of deposit before making the loan. They reason that requiring such security is inconsistent with including excess loan proceeds in the deal.

11

Defendants answer that neither GECU's loan officer assigned to this account, GECU's president, nor its lawyers who drafted and reviewed the loan documents testified. The jury heard no testimony concerning what these individuals knew at the time the loan was made. Further, they argue that the request for additional security is totally consistent with the additional risk involved in loaning excess proceeds.

There were two events referred to at trial as closings. The first was a meeting on March 26, 1987 at the law offices of Fulbright and Jaworski, who served as GECU's attorneys. After extended negotiations and redraftings, the parties concluded the agreement for the purchase of the brewery. The next day, the buyers and sellers attended a real estate closing at Texas American Title Company where the title to the real estate was transferred. No GECU employee, attorney or representative attended the second closing, although they were clearly entitled to be present. Nothing in the record explains their absence. From the first loan commitment, GECU reserved the right to have their lawyers draft or review every document necessary to close the deal. The details of the transaction changed many times between the initial proposal and final closing, which is typical for a complex, multi-party, multi-million dollar business deal. It is clear that the documents available at the real estate closing revealed all the relevant information, including who held title to the land, how the loan proceeds were being distributed, and Beach's true role in the

transaction.

The government introduced into evidence an early proposal from the defendants to GECU that includes a $2.2 million dollar item designated as the amount necessary to buy out prior partners. They asked the jury to infer that "prior partners" refers to Beach, who at that time was not a partner, and who, even when he became a partner in the joint venture, did not hold a $2.2 million dollar interest. However, at the time the document was drafted, the defendants were in negotiations with persons associated with the Campbell Estate whom they asked to join their joint venture. The agreement with Beach was not reached until later. In sum, the "prior partner" item was not a misrepresentation when drafted, and the myriad changes between that early proposal and the final deal, which eventually included Beach as a joint venturer, were revealed in the subsequent paperwork and the closing documents. GECU's failure to review the documents or send a representative to the closing does not make an otherwise legitimate, but complex, business transaction a crime. However, the government asked the jury to infer that the defendants structured the deal in this way in an effort to conceal Beach's true role in the transaction.

The record does reveal that defendants made one misrepresentation during the negotiations, which the government emphasized at trial. The original proposal included approximately 500 acres of real estate, appraised at $32 million. Later, 41 acres were carved out of that parcel and transferred to the

13

defendants free and clear.  There is evidence that the defendants lied to GECU about the *reason* for this change -- claiming that the 41 acre change resulted from "survey problems" which did not exist. A rational juror could certainly conclude that this was a misrepresentation, but it was simply not material to GECU's decision to loan the money.  The appraised value of the remaining property was accurately revealed and well in excess of the amount GECU determined was necessary to secure that portion of the loan.

These facts present a very close question.  However, we are unable to say that no reasonable juror could have found all of the elements of the charged crimes beyond a reasonable doubt.  In the event that the government elects to retry the defendants, the jury, after considering the admissible evidence without the taint of error, must make that determination.

## CONCLUSION

For the foregoing reasons, we reverse the defendants' convictions and remand for further proceedings.

REVERSED AND REMANDED.